UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CYNTHIA ANN HARGIS, | |
| Plaintiff, | Case No. 3:13-1096 |
| v. | Judge Trauger |
| | Magistrate Judge Newbern |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

## MEMORANDUM AND ORDER

Pending before the court in this Social Security action is Plaintiff Cynthia Ann Hargis's motion for judgment on the administrative record (Doc. No. 15), to which the Commissioner of Social Security has responded (Doc. No. 16). Hargis has filed a reply. (Doc. No. 17.) Upon consideration of these filings and the administrative record (Doc. No. 11),[2] and for the reasons given below, the court will DENY Hargis's motion for judgment and AFFIRM the decision of the Commissioner.

### I.     Statement of the Case

Hargis filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on October 5, 2009, alleging disability onset as of September 15, 2008, due to severe depression and spinal stenosis. (Tr. 235.)

---

[1]     Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin in that role. Berryhill is therefore appropriately substituted for Colvin as the defendant in this action, pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2]     Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

Tennessee Disability Determination Services denied Hargis's claims upon initial review and again following her request for reconsideration. Hargis subsequently requested de novo review of her case by an Administrative Law Judge (ALJ). The ALJ heard the case on January 25, 2012, when Hargis appeared with counsel and gave testimony. (Tr. 45–82.) A vocational expert also testified. At the conclusion of the hearing, the ALJ took the matter under advisement until April 3, 2012, when she issued a written decision finding Hargis not disabled. (Tr. 14–36.)

That decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant _has_ engaged in substantial gainful activity since September 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: Degenerative Disc Disease, lumbar spine; Degenerative Joint Disease; Chronic Obstructive Pulmonary Disease; Major Depressive Disorder versus Bipolar Disorder; Obesity; Anxiety Disorder; Borderline Personality Disorder; Polysubstance Abuse, in remission (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), including the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit for about six hours, stand for about six hours, and walk for about six hours—each with normal breaks—during the course of an eight-hour work day, except as follows:  From a mental perspective, the claimant is limited to jobs allowing for the ability to understand short and simple instructions, but she can appropriately interact with others, is able to adapt to work-related change, and is able to make simple work-related decisions.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on September 18, 1958 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 15, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16, 18–19, 22, 33–35.)

On August 1, 2013, the Appeals Council denied Hargis's request for review of the ALJ's decision, rendering that decision final. (Tr. 1–3.) This civil action seeking review was timely filed on October 4, 2013. 42 U.S.C. § 405(g).

## II. Review of the Record

The following summary of the evidence is taken from Hargis's motion for judgment on the record:

Plaintiff Cynthia Ann Hargis was born on September 18, 1958, and was with[in] a week of 50 years old on her alleged disability onset date, October 5, 2009. Tr. 34. As such, she was an individual closely approaching advanced age under the regulations.

In January 2008, Ms. Hargis was treated by Dr. James Seeley related to her back pain, as well as neck pain, arm pain and leg pain. Tr. 1005, 1008. She also reported shortness of breath, chest pain, cough, wheezes, nausea, vomiting, tiredness, weakness, joint pain or swelling, numbness, and dizziness, as well as a history of broken leg, knee surgery, and dog bite to her hand. *Id.* X-rays of her lumbar spine revealed lumbar spondylosis and facet arthropathy at L4-5 and L5-S1. Tr. 1007. She was also noted to have decreased strength/tone/range of motion and positive straight leg raise testing. Tr. 1006. Dr. Seeley also treated her regarding pulmonary and/or respiratory difficulties, and x-rays of her chest noted spondylosis of the thoracic spine. Tr. 998. By June 2008, she continued to report persistent back pain which was exacerbated by range of motion, and objective

examination again noted decreased strength/tone/range of motion and positive straight leg raise testing. Tr. 988–992.

An MRI of her lumbar spine from June 2008 revealed mild disc desiccation at L4-5 with bilateral facet arthropathy at L4-5 and L5-S1, as well as mild right foraminal stenosis at L4-5 and mild left foraminal stenosis at L5-S1. Tr. 286. She then underwent physical therapy for her persistent back pain with radiation to her lower extremities. Tr. 288–300. She reported pain rated as a five out of ten at rest, increased to eight or nine at times, worse with bending, sitting, standing, walking, or lying for long periods, progressively worsening during the day, and with varying lower extremity symptoms increased to moderately severe at times. Tr. 298–299. Nonetheless, she continued to suffer from persistent back pain and lower extremity symptoms despite her treatment and physical therapy. Tr. 288–300. She was also advised on multiple occasions to avoid flexion (such as bending, stooping and/or leaning forward). *Id.* An MRI of her lumbar spine from December 2008 again revealed facet joint arthropathy at L4-5 and L5-S1, as well as mild disc desiccation at L4-5. Tr. 285.

Dr. Seeley's treatment notes throughout this period also show Ms. Hargis' persistent difficulties with her back pain and lower extremity symptoms with decreased strength/tone/range of motion and positive straight leg raise testing despite treatment and medications. Tr. 962–986. These treatment notes also show her diagnosis of lumbar radiculopathy and disc displacement, and she was noted to have limited range of motion of the thoracic spine with tenderness, as well as bilateral rhonchi and wheezes in February 2009. *Id.*; *see* Tr. 968.

X-rays of Ms. Hargis' thoracic spine from March 2009 revealed mild focal T8-9 spondylosis with a small bridging osteophyte anteriorly and laterally. Tr. 973. X-rays of her cervical spine from August 2009 revealed no specific abnormality, although C6 and C7 were obscured. Tr. 972.

In [April] 2009, Ms. Hargis presented for a consultative medical examination with Dr. Roy Johnson. Tr. 323–325. Dr. Johnson's objective medical examination revealed tenderness of the lumbar spine with significantly decreased range of motion (and tearfulness), as well as decreased range of motion of the shoulders and hips, with a short and guarded gait and inability to squat and difficulty with tandem walk and balance. Tr. 324–325. Dr. Johnson diagnosed her with low back syndrome, decreased visual acuity, history of carpal tunnel bilaterally, and depression. Tr. 325. He also assessed her with limitations to lifting only 10 pounds occasionally, and standing or walking only 4.5-5 hours total with normal breaks. Tr. 325.

Ms. Hargis . . . presented to the emergency department in May 2009 related to her worsening back pain after being involved in a motor vehicle accident. Tr. 938–947. She reported low back pain rated as an eight out of ten, as well as some left

arm pain. Tr. 945–946. X-rays revealed degenerative subluxation of L5 on S1 related to **advanced** facet arthropathy. Tr. 938 (emphasis [in original]).

Dr. James Moore reviewed the evidence in June 2009 and provided an opinion regarding Ms. Hargis' capabilities and limitations due to her impairments. Tr. 362–370. Dr. Moore assessed her with limitations to light work with only occasional climbing ladders, ropes or scaffolds, frequent climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling, limited far acuity, and only frequent bilateral handling and fingering due to diagnostic evidence supporting carpal tunnel syndrome. *Id.*

Ms. Hargis presented for another consultative medical examination at SSA's request in December 2009 with Dr. Ashok Mehta. Tr. 371–382. Similar to Dr. Johnson, Dr. Mehta's examination revealed significantly decreased range of motion of the lumbar spine, as well as lumbar tenderness and muscle spasm, decreased range of motion of the lower extremities, and an unsteady, slow gait. Tr. 372, 374–375. Dr. Mehta also assessed Ms. Hargis with limitations to lifting or carrying only 10 pounds occasionally (no frequent lifting or carrying); sitting, standing and walking a total of less than an eight-hour workday; occasional climbing and balancing; and never stooping, kneeling, crouching or crawling (among other limitations). *Id.*

Ms. Hargis underwent a consultative psychological examination in January 2010 and was diagnosed with major depressive disorder, moderate, and obsessive compulsive disorder, mild-to-moderate. Tr. 386. She was further assessed with a global assessment of functioning (GAF) score of 54, indicating moderate symptoms, and assessed with moderate impairment in maintaining persisten[ce] and concentration for a full workday and work week, as well as social relationship. Tr. 386.

Dr. Saul Juliao reviewed the evidence in February 2010 and provided an opinion regarding Ms. Hargis' physical capabilities and limitations due to her impairments. Tr. 389–397. Dr. Juliao assessed her with limitations to light work with no climbing ladders, ropes or scaffolds, occasional climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling, and limited far acuity. *Id.*

Dr. Rudy Warren reviewed the evidence in March 2010 and provided an opinion regarding Ms. Hargis' mental capabilities and limitations due to her impairments. Tr. 398–411. Dr. Warren assessed her with moderate impairment in concentration, persistence or pace, as well as maintaining social functioning. Tr. 408.

Ms. Hargis received treatment for her chronic back pain in April 2010 through the emergency department of Nashville General Hospital. Tr. 417. She reported back pain for the prior two years and was noted to have a TENS unit in place. *Id.* She was noted to be "significantly obese" and was somewhat uncomfortable and

tearful during exam. Tr. 418. Examination revealed tenderness, muscle spasms, and decreased range of motion of the back and spine. Tr. 419.

Dr. Charles Settle reviewed the evidence in July 2010 and provided an opinion regarding Ms. Hargis' physical capabilities and limitations due to her impairments. Tr. 424–432. Dr. Settle assessed her with limitations to light work with no climbing ladders, ropes or scaffolds, occasional climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling, limited far acuity, and limited bilateral handling and fingering due to diagnostic evidence supporting carpal tunnel syndrome. *Id.*

Ms. Hargis was treated through the emergency department in July 2010 related to her hypertension and depression. Tr. 544–549. She was noted to have a flat affect and poor eye contact consistent with depression. Tr. 546.

Shortly thereafter, Ms. Hargis began mental health treatment through Centerstone for diagnoses of Major Depressive Disorder, recurrent, severe without psychotic features[;] borderline personality disorder[;] and obsessive-compulsive disorder, as well as cannabis and sedative/hypnotic/anxiolytic abuse. Tr. 558, 757–758, 924. She was noted to have symptoms of depression and anxiety, including sadness, loss of interest, loss of appetite, sleep disturbance, hopelessness, fatigue, and suicidal ideation, as well as counting corners and lines, twisting her hair, panic-type symptoms, and a very anxious appearance. Tr. 757, 891, 921. She was noted to have poor adaptive functioning, anxious and depressed mood, obsessive thought content, appetite disturbance, crying, lack of energy, loss of interest and pleasure, sleep disturbance, and poor insight, and she was assessed with a marked impairment in emotional/behavioral health. Tr. 759, 909–910, 921–922.

More specifically, she was assessed with marked impairment in activities of daily living and concentration, task performance and pace, as well as an inability to interact appropriately and communicate effectively with others, and regular or frequent difficulty in accepting and adjusting to change. Tr. 552–553; *see also* Tr. 555–557. Likewise, she was assessed with a GAF score of 45 (with her GAF ranging from 45-50 during the prior six months), indicating serious symptoms or serious impairment in social or occupational functioning. Tr. 554, 558, 758, 909–910, 921, 924; *see also* Tr. 555-557. These treatment notes document Ms. Hargis' abstinence from any substance abuse beginning sometime around March 2011, with persistent symptoms and difficulties despite her ongoing treatment and abstinence. *See* Tr. 679, 734, 755, 793; *see also* Tr. 552–924.

In February 2011, Ms. Hargis reported exacerbation of her back pain for the prior three months after a fall that injured her left knee, resulting in her favoring that leg which in turn aggravated her back. Tr. 461. She rated her pain as a six out of ten with intermittent episodes of pain rated as a ten out of ten. *Id.* It was also noted that she was previously managed by Dr. Seeley when she had insurance. *Id.* She also reported episodes of hypertension with lightheadedness, palpitations,

headache, blurry vision and feeling like a hot flash with heart pounding. Tr. 451, 457. In April 2011, Ms. Hargis presented for follow up regarding her chronic back pain [which] was progressively worsening, as well as knee pain, depression, and shortness of breath. Tr. 442. Records from June 2011 continued to show Ms. Hargis' reports of significant low back and hip pain with difficulty sleeping and radiation of her low back pain into her lower extremities. Tr. 434.

Ms. Hargis underwent psychiatric hospitalization in June 2011 related to her depression with suicidal ideation and plan to overdose on medications. Tr. 481. She reported decreased sleep, decreased appetite, poor concentration, hopelessness, helplessness, and possible auditory hallucinations. Tr. 481–482. She was diagnosed with major depressive disorder, recurrent, severe; borderline personality disorder; and cocaine dependence in early partial remission (last reported use November 2010). Tr. 481–482. She was also assessed with a GAF score of 50 at discharge, indicating serious symptoms or serious impairment in social or occupational functioning. Tr. 481.

Shortly thereafter, in July 2011, she again presented to the emergency department with depression and suicidal ideation and attempt. Tr. 930–937. Her urine drug screen was negative for any illicit substances. Tr. 936.

She returned in October 2011 with complaints of shortness of breath related to her asthma and COPD, and stated that she thought she had pulled a muscle from coughing so hard. Tr. 925–929. She was diagnosed with dyspnea and bronchitis with acute COPD exacerbation. Tr. 926. X-rays of her chest revealed moderate degenerative changes of the thoracic spine. Tr. 929.

In November 2011, Dr. Robert Miller completed a Medical Source Statement (Physical) in which he assessed Ms. Hargis with the following limitations: lifting 20 pounds occasionally and 10 pounds frequently; carrying 10 pounds occasionally; sitting 2 hours at one time and 4 hours total; standing 20 minutes at one time and 1 hour total; walking 15 minutes at one time and 1 hour total; occasional use of the bilateral upper extremities for reaching and handling; frequently using the bilateral upper extremities for fingering and feeling; . . . never pushing or pulling with the bilateral upper extremities; never operating foot controls; occasional climbing stairs and ramps; and never balancing, stooping, kneeling, crouching, crawling, or climbing ladders or scaffolds. Tr. 956–959.

Ms. Hargis was then treated at Shade Tree Clinic in November and December 2011 related to diagnoses of COPD, hypertension, and bipolar I disorder. Tr. 952. She continued to report chronic cough and chronic, persistent lower back and mid back pain (averaging a six out of ten), as well as persistent symptoms related to her depression and anxiety. *Id.* She returned in January 2012 with persistent complaints of pain and/or numbness in multiple locations, including her bilateral hands, back and shoulders. Tr. 948. She also continued to endorse significant mental health symptoms, including decreased sleep, decreased interest, decreased

energy, suicidal thoughts, mood swings, and expressing a desire to kill people who are making her angry. *Id.*

(Doc. No. 15-1, PageID# 1049–1056.)

At her hearing before the ALJ, Hargis testified that she had problems with her knees, had undergone surgery on her right knee, and had been prescribed a brace to wear on that knee. (Tr. 50.) She further testified that she had been told she would need a total knee replacement within ten or fifteen years. (*Id.*) She also has carpal tunnel syndrome in both hands, for which she wears splints at night. (Tr. 51.) She testified that she did not have private health insurance but had coverage under Safety Net, a government program through which she obtained medical treatment at the Shade Tree Clinic. (Tr. 51–52.)

Hargis testified that her other physical impairments included COPD, emphysema, and asthma. (Tr. 52.) She treated these conditions with inhalers and breathing treatments. (Tr. 52–53.) She continued to smoke cigarettes but had cut back since being put on the breathing treatments, with one pack lasting slightly more than a day. (Tr. 53.) She testified that she had not done street drugs for the past year, other than one relapse use of cocaine about six months prior to the hearing. (Tr. 53–54.) When asked by her attorney how she could afford to buy the drugs prior to quitting, Hargis testified "[w]ell, I worked." (Tr. 54.) She then clarified that she was not working one year prior to her hearing, but just "[s]mok[ed] with friends." (*Id.*)

Hargis testified that an automobile accident on May 23, 2009, worsened her back problems, and that "a numb tingling" was running from between her shoulders up to her neck. (Tr. 55.) She stated that she can sit for about fifteen minutes, but then the pain starts running up her back. (Tr. 55–56.) When she stands, the pain starts in her mid-to-lower back and then radiates down the sides of both legs and into the tops of her feet. (Tr. 56–57.) She stated that this

pain distribution had been happening since her back problems began when she was seven years old. (Tr. 57.)

She testified that she put on a lot of weight after being prescribed steroids and currently weighed around two hundred pounds at 4'9" height. (*Id.*) She stated that she had gained thirty pounds in the past month. (Tr. 57, 59.) She testified that her pain keeps her from walking more than short distances and that a doctor whose name she could not recall had recommended a cane in either 2005 or 2007. (Tr. 58–59.)

Hargis testified that she took a pain pill and Neurontin and also used a transcutaneous electrical nerve stimulation (TENS) unit to help relieve pain. (Tr. 60–62.) She stated that she could not lift any weight frequently and had to use both hands to pour from a gallon of tea. (Tr. 63.) She could not take a shower without excruciating pain in her back and legs. (Tr. 64.) She had to use a shower chair. (*Id.*) She had been living with a friend for the past two years. (*Id.*) She tried to help with the household chores, which took a long time because she had to take frequent breaks from standing. (Tr. 65.) She testified that she owned a car and could drive about ten minutes before her pain began. (Tr. 72.)

Hargis testified that she had received mental health treatment for depression and anxiety, but had been out of her prescription medication for about a month prior to the hearing. (Tr. 66.) She stated that she had been hospitalized twice for mental health issues. (Tr. 66–67.) She was brought to the hospital by ambulance in June 2011 after attempting to overdose on her medications. (Tr. 69–70.)

In its response brief, the Government summarized the testimony of the vocational expert as follows:

> Dr. Gordon Doss, a vocational expert ("VE"), testified at the administrative hearing. The ALJ asked the VE to consider an individual with Plaintiff's

vocational profile who was capable of occasionally lifting 20 pounds; frequently lifting ten pounds; sitting for four hours out of an eight-hour workday, for up to two hours at a time; standing and walking for an hour out of an eight-hour workday, for up to 15-20 minutes at a time; never pushing or pulling; occasionally reaching, handling, and fingering; never operating foot controls; occasionally climbing stairs and ramps; never climbing ladders, ropes, and scaffolds; never balancing, stooping, kneeling, crouching, or crawling; and never tolerating unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, or extreme temperatures (Tr. 28). The VE responded that such an individual could not work (Tr. 79).

The ALJ then asked the VE to consider a hypothetical individual with Plaintiff's vocational profile who could lift, carry, push, and pull up to 20 pounds; stand for six hours out of an eight-hour workday; walk for six hours out of an eight-hour workday; sit for six hours our of an eight-hour workday; understand and remember short and simple instructions; appropriately interact with others; adapt to change; and make simple work-related decisions (Tr. 79). The VE responded that such an individual could adjust to other work and provided examples including work as a house sitter (280 local jobs; 35,000 national jobs), a parking lot attendant (1,132 local jobs; 93,000 national jobs), or a courier (3,000 local jobs; 155,845 national jobs) (Tr. 80).

(Doc. No. 16, PageID# 1078–79.)

## III.    Analysis

### A.    Legal Standard

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This court reviews the final decision of the Commissioner to determine whether substantial evidence supports the agency's findings and whether the correct legal standards were applied. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). The court also reviews the decision for

procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id*. at 723. Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable

by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The agency considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Miller*, 811 F.3d at 835 n.6; 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the ALJ must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)). The agency can carry its burden at the fifth step of the evaluation process by

relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids function only as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the agency must rebut the claimant's prima facie case with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

### C.      Plaintiff's Statement of Errors

#### 1.      The ALJ's Step One Determination

As an initial matter, the ALJ found that Hargis's disability claim should be denied at step one of the sequential evaluation because Hargis had engaged in substantial gainful activity by selling cocaine and marijuana. (Tr. 16–18, 482.) Hargis alleges error in this determination and the Government does not defend it in its brief. (Doc. No. 16, PageID# 1082.) The ALJ based this finding on a statement in a discharge summary from Middle Tennessee Mental Health made on June 24, 2011, after Hargis attempted suicide. (Tr. 481–85.) That summary records a statement from Hargis that she "use[d] to sell cocaine and pot for the last four to five years." (Tr. 482.) The ALJ also notes that Hargis testified that she "worked" to support her daily marijuana habit and helped babysit a friend's children in exchange for a place to stay. (Tr. 17.)

The ALJ correctly found that illegal activity may constitute "substantial gainful activity" within the meaning of the disability regulations. *See Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 246 (6th Cir. 1996). However, in making the step one determination, the amount of money

earned by the claimant's activities is "key." *Id.* Indeed, there is a presumption against finding that a claimant engaged in substantial gainful activity if earnings from the work do not meet the amount set by regulation. 20 C.F.R. § 404.1574(b)(3). Here, the ALJ made no finding as to the amount Hargis may have earned from any illegal or legal activity during the relevant time period. Instead, she noted that Hargis's "[c]ertified earning records reflect a drop in *reported* earnings consistent with the alleged onset date, with no income during the 2009 calendar year and later," apparently assuming that Hargis had substantial income that she did not report. (Tr. 17.)

The Government does not argue that the ALJ's step one analysis is supported by substantial evidence (Doc. No. 16, PageID# 1082), and the court finds little in the record to indicate that it was. However, the court need not decide this issue. The ALJ continued with the sequential evaluation process "to establish that there were multiple grounds against a finding of disability in this case, as relating to all times since the alleged onset date until the date of the decision," ultimately also finding Hargis not disabled at step five of her analysis (Tr. 18, 34–35.) The court now considers that alternative basis for the ALJ's not-disabled determination.

### 2. The ALJ's Characterization of Radiological Evidence

Hargis argues that, in considering the radiological evidence of her spinal impairment, the ALJ "significantly misrepresent[ed] and/or mischaracterize[ed]" that evidence by failing to note that x-rays from May 2009 revealed advanced facet arthropathy and by omitting any reference to an October 2011 x-ray report of moderate degenerative changes of the thoracic spine.

As the Government points out, the May 2009 radiologist's report is internally inconsistent. It states, with regard to alignment, "[s]light anterior subluxation of L5 on S1 is related to moderate facet arthropathy. Alignment elsewhere is normal." (Tr. 938.) With regard to facets it states, "[f]acet arthropathy at L4–L5 and L5–S1." (*Id.*) Finally, the report states the radiologist's impression as "[n]o acute abnormality. Degenerative sublaxation of L5 on S1 is related to advanced facet arthropathy." (*Id.*) The radiologist's report thus variously describes Hargis's facet arthropathy as moderate, advanced, and without qualification. The ALJ described the report as showing "*Slight* anterior subluxation of L5 on S1 related to facet arthropathy;

normal alignment elsewhere; unspecified spondylosis in the lower thoracic spine; and no evidence of acute change." (Tr. 25.) The ALJ thus recognized the finding of facet arthropathy and resolved the conflicting descriptors in a way that is consistent with the overall tenor of the radiologist's report. The ALJ did not significantly misrepresent the evidence in doing so.

Likewise, the ALJ's failure to mention the October 11, 2011 chest x-ray report that found "[n]o evidence of acute intrathoracic process" and noted moderate degenerative changes of the thoracic spine (Tr. 929) does not misrepresent significant medical evidence. The ALJ noted that Hargis's October 11, 2011 visit to Skyline Medical Center was to address shortness of breath, though it was "incidentally noted that there was a full range of motion in all extremities." (Tr. 27.) The ALJ further found that, "[a]lthough there is evidence of some degenerative change, particularly in the thoracic and lumbar regions, the weight of the evidence does not come anywhere near [supporting] what has been alleged [i]n this case." (Tr. 28.) The ALJ thus accounted for the radiological evidence of degenerative changes and did not misstate the objective severity of the conditions that this evidence revealed. The court finds no reversible error here.

### 3. The ALJ's Rejection of Treating Physician Dr. Miller's Opinion

Hargis next argues that the ALJ erroneously rejected the opinion of her treating physician, Dr. Miller. In a checkbox assessment dated November 1, 2011, Dr. Miller opined that, as of January 1, 2011, Hargis was capable of occasionally lifting up to twenty pounds and frequently lifting up to 10 pounds, could only carry up to 10 pounds occasionally, could sit for two hours at a time and four hours total in an eight-hour workday, and could only stand or walk for a total of one hour each during her workday. (Tr. 956–57.) Dr. Miller further opined that Hargis was limited in handling and was totally precluded from operating foot controls. (Tr. 958.) He also stated that Hargis had almost no capability to perform postural activities like climbing, balancing, stooping, kneeling, or crawling, and that her visual impairment left her unable to avoid ordinary workplace hazards. (Tr. 959.) Finally, Dr. Miller opined that Hargis could never be exposed to any irritating or dangerous environmental conditions, except for moderate noise

exposure, occasional vibrations, and occasional operation of a motor vehicle. (Tr. 960.) Dr. Miller found that Hargis could engage in activities such as shopping and could travel without a companion for assistance, ambulate without assistance, and walk a block at a reasonable pace on rough or uneven surfaces. (Tr. 961.)

If an ALJ finds a treating physician's opinion not entitled to controlling weight because it is inconsistent with other substantial evidence in the record, the ALJ must then weigh the opinion in light of factors including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician," and give good reasons for the weight she ultimately assigns to the opinion. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). "When deciding if a physician's opinion is consistent with the record [as a whole], the ALJ may consider evidence such as the claimant's credibility, whether or not the findings are supported by objective medical evidence, as well as the opinions of every other physician of record." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442 (6th Cir. 2010).

The ALJ weighed Dr. Miller's opinion as follows:

Although [Dr. Miller's November 2011 assessment] was written by a treating physician, the undersigned must consider it in view of Social Security Ruling 96-2p, which directs that controlling weight may not be given to a treating source's medical opinion unless it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and which further directs that the undersigned cannot decide a case in reliance on a medical opinion without some reasonable basis for that opinion. In this instance, the reasonable basis does not exist. First, [Miller] did not even attempt to provide a reason for the limitations he gave. Second, the limitations were poorly supported within the objective medical evidence. Third, a portion of the limitations were facially invalid: For instance, a restriction against *any* use of the lower extremities in the working of foot controls prohibits all driving, yet Dr. Miller allowed for occasional operation of a motor vehicle. Fourth and finally, by [his] statement's own terms, a substantial interval following the alleged onset date is outside the scope of the opinion, because Dr. Miller stated the claimant's impairments only began as of January of 2011. For all of these reasons, the undersigned provides little weight to the conclusions of Dr. Miller, except to agree that the claimant does not require aids to ambulation.

(Tr. 33.)

In assigning little weight to Dr. Miller's opinion, the ALJ appropriately considered both the opinion's internal inconsistency and its inconsistency with the objective medical evidence as a whole, as well as the length of the treatment relationship vis-à-vis the period of alleged disability under review. Hargis acknowledges that Dr. Miller's assessment is not supported by contemporaneously cited evidence but argues that it is supported by his treatment notes and is consistent with the findings and opinions of the consultative examiners Dr. Johnson and Dr. Mehta. However, the ALJ thoroughly reviewed the treatment notes from Shade Tree Clinic, where Dr. Miller practices, beginning February 5, 2011 (Tr. 26–27, 434–80), as well as the findings and assessments of the consultative examiners (Tr. 26), noting inconsistencies in each between Hargis's reported symptoms and the objective measurements obtained upon examination. The ALJ's conclusion after reviewing this evidence is set out in full below:

> The evidence, as thus described, does not point to any event, significant objective finding, or circumstance that would validate any degree of exertional limitation in a way that is inconsistent with the above residual functional capacity. Neither do they support postural, environmental, or other limitations. Although the claimant manifested an abnormal gait, was unable to squat or rise, and showed considerable range of motion limitations in the lumbar spine and hips during both consultative examinations (and to a lesser extent, the shoulders as well, see Ex. 4-F, 10-F), these are not well supported because of numerous credibility concerns, as previously identified. Although there is evidence of some degenerative change, particularly in the thoracic and lumbar regions, the weight of the evidence does not come anywhere near [supporting] what has been alleged [i]n this case. Regarding the need for a cane, brace, crutch, splint, or any other type of ambulatory aid whatsoever, there was again very little support for any of these devices . . . contained in the limited record before us. And although the claimant alleged she did not receive medical care for substantial intervals secondary to a lack of health insurance, the records reflect that in fact, she did avail of services for people of limited means, such as the Shade Tree Clinic, and she also used the emergency room on a number of occasions for various complaints. So that there is no room for doubt or ambiguity on the point, let there be plainness:  The claimant's allegations were flatly not believable, and in places bordered on dishonesty.

(Tr. 27–28.)

In highlighting the objective clinical and radiological evidence obtained by Dr. Miller and others, which shows a lesser degree of impairment than is found in Dr. Miller's assessment of Hargis's 2011 functioning, the ALJ has given good reasons for rejecting Dr. Miller's opinion, particularly when combined with the identification of internal inconsistencies and the overarching finding that Hargis's reports of symptoms and limitations to her providers and to the SSA were not credible. *See Coldiron*, 391 F. App'x at 440 (finding good reason for according reduced weight to treating physician opinion where it lacked internal consistency and was undermined by other medical evidence and claimant's reduced credibility). Substantial evidence thus supports the ALJ's affording Dr. Miller's opinion little weight.

### 4. The ALJ's Adverse Credibility Determination

Hargis challenges the ALJ's determination of her credibility, arguing that the ALJ found her not credible based solely on her history of drug use and that her consistent effort to seek relief from her pain and the consistency of the consultative examiners' opinions should have bolstered her credibility regarding her limitations. However, the ALJ meticulously established that her adverse credibility finding was based not only on Hargis's criminal activity but also on her lack of candor with her treating sources, with the consultative examiners retained by the Government, and with the ALJ herself from the witness stand. (Tr. 23–32.) The ALJ considered Hargis's credibility in great detail, and her finding is supported by substantial evidence, especially given the deference due to credibility determinations by ALJs who, unlike reviewing judges on appeal, have the opportunity to observe a claimant's demeanor while testifying. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Such credibility findings are not to be disturbed

"absent compelling reason," *Smith v. Halter*, 307 F.3d 377 (6th Cir. 2001), and no such reason exists in this case.

### 5. The ALJ's RFC Determination

Hargis argues that the ALJ's determination of her RFC did not track any of the medical opinions of record, that it was less limiting than all assessments from examining and nonexamining sources, and that the ALJ therefore "essentially substituted her own lay opinion" for the opinions of the experts. (Doc. No. 15-1, PageID# 1065.) She points to medical evidence from her consultative physical examinations that supports her alleged limitations, arguing that those "findings are more credible and reliable than any potential, vague contrary findings from other evidence in the record" upon which the ALJ relied. (*Id.* at PageID# 1064.) This argument is directed to the evidence regarding postural and range-of-motion limitations considered by the examining and nonexamining consultants and amounts to an invitation to this court to reweigh that evidence. However, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility," *Ulman*, 693 F.3d at 713, nor may the ALJ's decision, if supported by substantial evidence, be set aside on grounds that the record contains significant evidence supporting the opposite conclusion. *See Hernandez*, 644 F. App'x at 473. Moreover, "[t]he Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron*, 391 F. App'x at 439. In *Coldiron*, the Sixth Circuit rejected the argument that "because each of [Coldiron's] treating and examining physicians concluded that he could not perform sedentary work during the challenged period, the ALJ impermissibly acted as a medical expert by rendering a sedentary work RFC. . . ." *Id.* The court recognized that the ALJ is charged with weighing the non-medical evidence, including the claimant's testimony, against

the medical evidence in rendering her RFC finding and does not "improperly assume the role of a medical expert" by doing so. *Id.*

Here, the ALJ properly noted inconsistencies between Hargis's complaints and the radiological and other objective evidence, such as test results showing full and pain-free range of motion. (Tr. 25–26.) She also provided the following analysis in support of her RFC finding:

> At the time of the hearing, counsel's original theory of the case was that on the amended alleged onset date, the claimant experienced a severe worsening of her lumbar condition as the result of a motor vehicle collision in May of 2009. However, . . . there was no evidence of acute change, and the plain films of the lumbar spine were not inconsistent with earlier visual studies; in fact, it was diagnosed as lumbosacral strain. What is curious to note is that on April 22, 2009, which would have been shortly *before* the motor vehicle accident, she presented to Roy Johnson, M.D., in the setting of a consultative evaluation with a dramatically reduced range of motion, with 30 degrees of flexion, *zero* degrees of extension, and 5 degrees of right and left flexion, with an inability to squat, rise, or heel-toe walk, and could not balance, save it were briefly. These objective findings are poorly supported, not only because of the credibility concerns that were already identified, and not only because the longitudinal evidence both prior to and following the encounter do not validate such profound range of motion limitations, but also because there is so little evidence of medical treatment as between the date of the accident and the balance of the year.

(Tr. 25–26.) This analysis, combined with the ALJ's findings that Hargis was "flatly incredible" in her testimony regarding pulmonary issues (Tr. 29) and demonstrated an "[in]ability to accurately and honestly describe her actual limitations" to her doctors or to the ALJ (Tr. 32), is sufficient to support the ALJ's finding that Hargis can, "from a purely physical standpoint, [perform] a full range of light work, because there was little substantial evidence pointing to a different result." (Tr. 33.)

### 6. The ALJ's Consideration of Treating Mental Health Providers

Hargis next argues that the ALJ erred in failing to give due consideration to the opinions of her treating mental health providers, primarily as expressed in their ratings of Hargis on the Global Assessment of Functioning (GAF) scale and the Tennessee Clinically Related Group

(CRG) assessment form. Hargis claims that the ALJ failed to comply with the requirements of Social Security Ruling (SSR) 06-03p, which establishes the standard for consideration of opinions from "other sources," such as her mental health care providers, who are not physicians, psychiatrists, or psychologists. The ALJ thoroughly reviewed the evidence from these providers in determining Hargis's mental RFC. (Tr. 29–31.)

Social Security Ruling 06-03p provides, *inter alia*, that the ALJ should make explicit her consideration of "other source" evidence, if not the actual weight such evidence is given, where that evidence could potentially sway the ultimate determination of the claimant's case toward a finding of disability. SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006). The Tennessee CRG form would not be expected to affect the ALJ's ultimate determination, however, because the evaluation made on that form is not directed to the ultimate issue of the patient's work-related abilities and limitations, but is instead a means of ascertaining the patient's mental health treatment classification for purposes of determining her entitlement to state-sponsored healthcare. *See Rosen v. Tenn. Comm'r of Health*, No. 3:98-0627, 2005 WL 3740426, at *18 (M.D. Tenn. Apr. 28, 2005) ("'Most states have a way of identifying persons who are SPMI [(severely and persistently mentally ill)]. . . . Tennessee uses an evaluation tool known as the Clinically Related Group (CRG) assessment to classify individuals into the SPMI designation. . . . Tennessee has been using the CRG assessment process since before the inception of TennCare to identify the SPMI population.'"), *rev'd on other grounds*, *Rosen v. Goetz*, 410 F.3d 919 (6th Cir. 2005). To the extent that any rating reflected in that form is properly considered opinion evidence from "other sources" pursuant to SSR 06-03p, its potential to materially impact the determination of work-related abilities and limitations is extremely limited.

As for Hargis's GAF scores, such scores have long been held to be of limited utility in the disability determination, as they are not a reasonable replacement for the more particularized data available in actual treatment notes or reports of examination results and instead are largely superficial descriptors representing "a clinician's subjective rating of an individual's overall psychological functioning" in terms "understandable by a lay person." *See*, *e.g.*, *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *see also Smith v. Astrue*, 565 F. Supp. 2d 918, 925 (M.D. Tenn. 2008). The standard of SSR 06-3p is not a demanding one, *Morris v. Comm'r of Soc. Sec.*, No. 1:11-cv-154, 2012 WL 4953118, at *11 (W.D. Mich. Oct. 17, 2012), and was satisfied here, where the ALJ reviewed the evidence at issue and drew the following conclusions:

> Turning to the opinion evidence regarding the claimant's mental impairments, there were no medical source statements from any of the claimant's treating physicians or clinicians with respect to the claimant's mental limitations, with the possible exception of the GAF scores and Tennessee Clinically Related Group (TCRG) assessments as provided through Centerstone and MTMHI. In the end, each was given very limited weight, not only because of the relatively limited length of contact each provider had with the claimant, and also because a number of the assessments occurred when she was in an essentially untreated state, but also because of the claimant's repeated instances of noncompliance with treatment and advice, which served to complicate treatment efforts.

(Tr. 33.) These conclusions and the ALJ's findings with regard to Hargis's mental RFC are supported by substantial evidence.

### 7. The Vocational Expert's Testimony

Finally, Hargis argues that the ALJ erred in relying on vocational expert testimony that is inconsistent with the Dictionary of Occupational Titles (DOT), in violation of SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000). In response, the Government argues that there was no such inconsistency in the expert's testimony. However, the court need not resolve this issue because the alleged inconsistency was not identified at the administrative hearing or otherwise brought to the ALJ's attention before the issuance of her decision. Where a conflict between the vocational

expert's testimony and the DOT is not raised before the ALJ, she is under no obligation to conduct an independent examination to find it. *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006). The ALJ asked the expert if his testimony was consistent with the DOT, and the expert replied that it was. (Tr. 81.) Hargis did not bring the alleged conflict to the ALJ's attention and so the ALJ was entitled to rely on the expert's testimony. *Martin*, 170 F. App'x at 374. The court finds no error here.

**IV.  Conclusion**

In light of the foregoing, Hargis's Motion for Judgment on the Administrative Record (Doc. No. 15) is DENIED and the decision of the ALJ is AFFIRMED.

It is so **ORDERED**.

**ENTERED** this 29th day of August, 2017.

_____

ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE